UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

<table>
<tr><td>

VICTORIA FELONI,

    Plaintiff,

      v.

ALEJANDRO N. MAYORKAS, Secretary of the U.S. Department of Homeland Security,

    Defendant.

</td><td>

Civil Action No. 22-2094 (JEB)

</td></tr>
</table>

## MEMORANDUM OPINION

Plaintiff Victoria Feloni is a former employee of Immigration and Customs Enforcement who unsuccessfully sought to become a Deportation Officer. ICE requires that male and female trainees for that position meet the same physical-fitness standards, which Plaintiff could not attain. Feloni alleges that this policy has an adverse impact on women and that her eventual termination from ICE amounts to discrimination on the basis of sex. She also brings a disparate-treatment claim in this lawsuit, as well as counts for disability discrimination and retaliation. Defendant Department of Homeland Security, which houses ICE, now moves to dismiss, arguing that the Court lacks subject-matter jurisdiction over certain of Plaintiff's claims and that the remainder are unsubstantiated. The Court will grant the Motion in part and deny it in part.

## I.      Background

The Court at this stage sets forth the facts as pled in the Complaint, assuming them to be true. See Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000). Feloni joined ICE as a GS-07 Deportation Officer in the Burlington, Massachusetts, field office on April 14, 2019, which position was contingent on her completing a Physical Ability Assessment

(PAA) at the Federal Law Enforcement Training Center (FLETC).  See ECF No. 1 (Compl.), ¶¶ 11, 18.  The PAA consists of two elements: (1) the Criterion Task Testing (CTT), which is a timed obstacle course; and (2) a 1.5-mile run, which trainees must complete in under 16 minutes and 30 seconds.  Id., ¶ 12.  Unlike many other law-enforcement agencies, ICE requires that male and female trainees meet the same fitness standards.  Id.

Feloni took the PAA for the first time on May 8, 2019, but did not satisfy the CTT component.  Id., ¶ 20.  As a consequence, she alleges that she was entitled to perform remedial testing, which included a push-up component, although Feloni does not make clear how these remedial tests related to the PAA and CTT.  Id., ¶ 11, 22.  The first time she attempted the push-up component, her knee touched the ground while completing the exercises; the second time, a training instructor determined that Plaintiff had moved her left hand.  Id., ¶¶ 22–23.  Feloni alleges that this instructor, who proceeded to "scream at [her] in front of everyone," singled her out because of her gender.  Id., ¶ 23.  Plaintiff thus failed the training program and departed FLETC on May 16, 2019.  Id., ¶¶ 23–24.

After pandemic-related delays, Feloni returned to FLETC in September 2020 to attempt the PAA again.  Id., ¶ 25.  This time, presumably because of her prior failure to successfully finish the PAA, ICE required her to complete both prongs in an even shorter time period.  Id., ¶ 26.  Despite this more stringent standard, Plaintiff completed the CTT within the required time. Id., ¶ 27.  She unfortunately finished the 1.5-mile run 6 seconds slower than the new required time of 14 minutes 30 seconds and sprained her ankle in the process.  Id.  Given her inability to

pass, Feloni returned to the Burlington field office and was demoted to a GS-04 Mail Room Clerk position.  Id., ¶¶ 29, 31.

Plaintiff responded by filing an Equal Employment Opportunity (EEO) class and individual complaint against the agency for gender and disability discrimination on January 7, 2021.  Id., ¶ 34.  Less than three weeks later, she received notice that Unit Chief Jack Bonner of the ICE Academy had proposed her termination for failure to complete the required ICE training program.  Id., ¶ 35.  Plaintiff, however, was not fired, id., ¶ 36, and she instead returned to FLETC for a third time in September 2021 to retry the PAA.  Id.  She again successfully completed the CTT but suffered a severe asthma attack during the 1.5-mile run and did not finish in the required time period.  Id.  The doctor who treated Feloni following the run allegedly informed her that students who experience asthma attacks are typically given the opportunity to reattempt the run a few days later.  Id.  Plaintiff, however, was not so permitted.  Id.  She received notice on January 21, 2022, that the agency sought her termination from ICE for failure to complete the PAA — a condition of her employment.  Id., ¶ 37.  Feloni was removed from federal service effective June 21, 2022.  Id.

She thus filed this suit against the Secretary of the Department of Homeland Security the next month.  See Compl. (filed July 15, 2022).  Her Complaint contains four counts: disparate impact under Title VII (Count I); intentional discrimination also under Title VII (Count II); disability discrimination under the Rehabilitation Act (Count III); and retaliation under both laws (Count IV).  Id. at 11–14.  Defendant now moves to dismiss certain claims for lack of subject-matter jurisdiction and others for failure to state a claim.  See ECF No. 6-1 (MTD) at 1.

The Court notes that in her Opposition Plaintiff requests that this "case be stayed until discovery is complete" in a related class action filed by Feloni that is currently pending before

the EEOC.  See ECF No. 10 (Opp.) at 4.  (She withdrew her individual EEO complaint on July

28, 2022.  See ECF No. 6-10 (Notice of Withdrawal) at 1.)  The outcome of that EEOC

proceeding, however, has no bearing on the Court's disposition of the Motion to Dismiss here.

As a result, the Court sees no reason entertain her request.

## II.    Legal Standard

Federal Rule of Civil Procedure 12(b)(1) permits dismissal of a complaint for lack of

subject-matter jurisdiction.  In general, courts must first address jurisdictional arguments before

turning to the merits.  See Sinochem Int'l Co. v. Malaysia Int'l Shipping Co., 549 U.S. 422, 430–

31 (2007).  A plaintiff bears the burden of proving that a court has subject-matter jurisdiction to

hear her claims.  See Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992); U.S. Ecology, Inc. v.

U.S. Dep't of Interior, 231 F.3d 20, 24 (D.C. Cir. 2000).  A court has an "affirmative obligation

to ensure that it is acting within the scope of its jurisdictional authority."  Grand Lodge of the

Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  For this reason,

"'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a

12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  Id. at 13–14

(quoting 5A Charles A. Wright & Arthur R. Miller, Fed. Practice & Procedure § 1350 (2d ed.

1987)).  Additionally, unlike with a motion to dismiss under Rule 12(b)(6), a court "may

consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack

of jurisdiction."  Jerome Stevens Pharms., Inc., 402 F.3d at 1253; see also Herbert v. Nat'l Acad.

of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

Federal Rule of Civil Procedure 12(b)(6), on the other hand, permits dismissal of a

complaint for failure to state a claim upon which relief may be granted.  In evaluating such a

motion to dismiss, courts must "treat the complaint's factual allegations as true . . . and must

grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow, 216 F.3d at 1113 (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)). Although "detailed factual allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570) — that is, the facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

The Court need not accept as true "a legal conclusion couched as a factual allegation," Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)), nor "inferences . . . unsupported by the facts set out in the complaint." Id. (quoting Kowal v. MCI Communications Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994)). And it may consider not only "the facts alleged in the complaint," but also "any documents either attached to or incorporated in the complaint[,] and matters of which [courts] may take judicial notice." Equal Emp. Opportunity Comm'n v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997).

## III. Analysis

In seeking dismissal here, Defendant contends that: 1) Plaintiff has no standing to bring her disparate-impact claim; 2) she has not exhausted administrative remedies as to her disparate-impact and Rehabilitation Act claims; and 3) in any event, she has not adequately pled any of her four counts. See MTD at 1. The Court addresses each of these arguments in turn.

A.    <u>Standing</u>

As a threshold matter, DHS moves to dismiss Count I on the ground that Feloni lacks standing to bring a disparate-impact claim under Title VII. <u>See</u> MTD at 14. "[T]he irreducible constitutional minimum of [Article III] standing contains three elements." <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 560 (1992). "First, the plaintiff must have suffered an 'injury in fact.'" <u>Id.</u> "Second, there must be a causal connection between the injury and the conduct complained of — the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." <u>Id.</u> (internal quotations and alterations omitted). "Third, it must be 'likely,' . . . that the injury will be 'redressed by a favorable decision.'" <u>Id.</u> at 561. Defendant argues that Plaintiff here cannot satisfy those requirements. <u>See</u> MTD at 15–16.

DHS first asserts that Feloni's injury — in this case, her inability to complete training and her subsequent termination — is not "fairly traceable" to "any physiological difference between men and women." <u>Id.</u> at 17. Instead, Defendant argues, Plaintiff's injury stems from "her own individual characteristics." <u>Id.</u> at 16. This misses the point. An individual plaintiff arguing a disparate-impact theory need only "show that the challenged policy directly disadvantaged [her] in some fashion.'" <u>Young v. Covington & Burling LLP</u>, 740 F. Supp. 2d 17, 21 (D.D.C. 2010) (quoting <u>Bacon v. Honda of Am. Mfg.</u>, 370 F.3d 565, 577 (6th Cir. 2004)). An injury may result from a complicated chain of causation, but if it is "fairly traceable" to a policy that disparately impacted a protected group, the plaintiff satisfies the second <u>Lujan</u> prong. <u>See</u> <u>Koger v. Reno</u>, 98 F.3d 631, 639 (D.C. Cir. 1996) (explaining that hypothetical-promotion rubric made up of many tests, only one of which had disparate impact, would still "demonstrate[] a causal link" between discriminatory test and disparate end result).

In this case, Feloni's relevant injury is her termination, which she fairly traces to her failure to satisfy ICE's allegedly discriminatory fitness requirements.  She further alleges that the test discriminates against women.  See Compl., ¶¶ 40–42 ("Absent these discriminatory policies, Plaintiff otherwise would have met the physical standards for women required by other federal law enforcement agencies and successfully would have become an ICE deportation officer.").  As a woman who failed an allegedly discriminatory test and consequently suffered an adverse employment action, Plaintiff satisfies the second Lujan prong.

Next, in an argument that could be interpreted as targeting either redressability or imminence of the injury, DHS asserts that the Court cannot grant Feloni declaratory or injunctive relief if she is unlikely to be wronged again in the future in a similar fashion.  See MTD at 15–16 (citing City of Los Angeles v. Lyons, 461 U.S. 95, 105–09 (1983)).  But Plaintiff's injuries are ongoing because she was terminated and remains barred from future ICE employment given its physical-fitness requirements.  See Compl., ¶ 42; cf. Worth v. Jackson, 451 F.3d 854, 859 (D.C. Cir. 2006) (noting that plaintiff who intended to apply for job with allegedly discriminatory hiring policy had "eminently redressable" injury).  Plaintiff, moreover, specifically seeks reinstatement as a trainee "to complete training . . . under nondiscriminatory standards."  Compl., ¶ 58.  "As a general rule, a district court 'has broad discretion to fashion appropriate equitable relief for a Title VII plaintiff' including, but not limited to, reinstatement."  Webb v. D.C., 146 F.3d 964, 976 (D.C. Cir. 1998) (citing Castle v. Rubin, 78 F.3d 654, 657 (D.C. Cir. 1996)); see also 42 U.S.C. § 2000e–5(g)(1) (listing "reinstatement" and "other equitable relief as the court deems appropriate" as possible remedies).  Because Feloni seeks a form of relief that this Court may grant — in addition to damages, which Defendant does not challenge — and because the

injury for which she seeks redress is ongoing, she satisfies the requisite elements of standing to pursue her disparate-impact claim.

      B.    <u>Exhaustion</u>

      The next threshold obstacle DHS points to is exhaustion in regard to both Counts I and III.

          1.    *Count I (Disparate Impact)*

      Title VII plaintiffs may file an action in federal court only after exhausting their administrative remedies.  <u>See</u> <u>Payne v. Salazar</u>, 619 F.3d 56, 65 (D.C. Cir. 2010).  An individual seeking to challenge an unlawful employment practice under Title VII must file a charge with the EEOC within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e–5(e)(1).  Title VII plaintiffs, moreover, "'must timely exhaust administrative remedies <u>for each discrete act alleged</u> [,]' even if the acts are related."  <u>Mount v. Johnson</u>, 36 F. Supp. 3d 74, 84 (D.D.C. 2014) (quoting <u>Laughlin v. Holder</u>, 923 F. Supp. 2d 204, 209 (D.D.C. 2013)).

      Title VII's exhaustion requirements are not jurisdictional, and, accordingly, a "12(b)(6) motion to dismiss for 'failure to state a claim upon which relief can be granted' is the appropriate vehicle to challenge an alleged failure to exhaust" administrative remedies under Title VII.  <u>See</u> <u>Rosier v. Holder</u>, 833 F. Supp. 2d 1, 5 (D.D.C. 2011) (citing <u>Artis v. Bernanke</u>, 630 F.3d 1031, 1034 n.4 (D.C. Cir. 2011)).

      As just discussed, Count I advances a disparate-impact theory of liability under Title VII. <u>See</u> Compl., ¶¶ 38–42.  In that count, Feloni alleges that ICE discriminated against her on the basis of sex on several instances between 2020 and 2022: removing her from FLETC in September 2020, demoting her from Deportation Officer in October 2020, and ultimately

terminating her employment in June 2022.  See id., ¶¶ 29, 32, 37.  (As there is no distinction

between the first two for adverse-action purposes, the Court treats them as one.)  Plaintiff posits

that ICE took these actions "due to her failure to meet physical training requirements that were

the same for men and women" — a policy that she maintains has a disparate impact on females.

Id., ¶¶ 2, 38–42.  Defendant, however, argues that Feloni has not exhausted the claim regarding

her termination because she submitted her EEO complaint on January 7, 2021, and never filed

anything afterwards.  See MTD at 13–14.  DHS does not raise the same challenge to her

demotion claim in Count I, as that arises from events preceding the EEO charge.  Id.

    In considering the Motion to Dismiss, the Court here may rely on EEO's Notice of

Charge, see ECF No. 6-3, Exh. 2 (Notice of Charge) at 98, and Letter of Acceptance, see ECF

No. 6-3, Exh. 2 (Letter of Acceptance) at 90, without converting it into one for summary

judgment.  See Ndondji v. InterPark Inc., 768 F. Supp. 2d 263, 272 (D.D.C. 2011) ("A court may

consider an EEOC complaint and Notice of Charge without converting a motion to dismiss into a

motion for summary judgment because such records are "'public document[s] of which a court

may take judicial notice.'") (quoting Ahuja v. Detica Inc., 742 F. Supp. 2d 96, 101–02 (D.D.C.

2010)); see also Ward, 768 F. Supp. 2d at 120 n.2 (considering EEO charge and letter of

determination because plaintiff "necessarily relies upon the fact of the charge and the letter in

pleading that administrative proceedings were pursued before this action was begun").  There is

no dispute that the EEO charge was filed in January 2021 and that she was not terminated until

June 2022.  See Notice of Charge at 98; Letter of Acceptance at 90; Compl., ¶ 37; MTD at 5, 8.

As a result, she appears to be barred from bringing a termination claim.

    Feloni insists, nonetheless, that such a claim is properly before the Court.  See Opp. at 11.

In support, she invokes Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002), and

maintains that the Court should reach the question of her termination because it was the culmination of a "continuing pattern of conduct" and because it was "like or related to" claims included in her EEO charge.  See Opp. at 12, 15–16.  In the alternative, she contends that the Court should exercise its equitable powers to hear her claim despite her failure to exhaust administrative remedies.  Id. at 12.  Neither position is persuasive.

First, Plaintiff badly misreads Morgan.  That case distinguishes between Title VII plaintiffs bringing a hostile-work-environment suit — who need not exhaust administrative remedies for every allegedly discriminatory act giving rising to their claim — and plaintiffs challenging terminations, demotions, and other discrete acts, who must do so.  See Morgan, 536 U.S. at 115.  "Discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a new clock for filing charges alleging that act.  The charge, therefore, must be filed within the 180- or 300-day time period after the discrete discriminatory act occurred."  Id. at 113 (emphasis added).  Because Feloni is plainly challenging a discrete act — i.e., her termination from ICE — the "continuing violations doctrine" that she invokes is of no help.  Likewise, it is immaterial that her wrongful-termination claim may be related to allegations that she made in her timely filed EEO complaint.  See Mount, 36 F. Supp. 3d at 83 ("[A] Title VII plaintiff must file an administrative charge for each incident, even when the other claims are like or related to acts alleged in a timely-filed administrative complaint.").

Nor are the doctrines of equitable tolling or estoppel that Plaintiff mentions apposite here.  See Opp. at 11.  A Title VII claimant is "entitled to equitable tolling only if [s]he shows (1) that [s]he has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way and prevented timely filing."  Dyson v. District of Columbia, 710 F.3d 415,

421 (D.C. Cir. 2013) (quoting Holland v. Florida, 560 U.S. 631, 649 (2010)).  Feloni maintains that tolling is appropriate in this case because of the "prejudicial steps" the EEOC took in its investigation of her January 7, 2021, complaint.  See Opp. at 15.  Even assuming that the EEOC untimely and incompletely investigated the allegations that she made in that filing, see Compl., ¶ 8; Opp. at 8–9, Plaintiff does not explain why this left her unable to file a new EEO complaint challenging her June 2022 termination.  Cf. Dyson, 710 F.3d at 422 ("Appellant bears full responsibility . . . for her extreme delay in filing her Intake Questionnaire with the EEOC . . . .").  Indeed, Feloni knew that she had been terminated, knew how to file an EEO charge, and "had good reason to know when she" was required to file — but she did not act.  Id. at 421; see Reply at 4.  Plaintiff's unfiled claim, then, does not merit equitable tolling.  See Morgan, 536 at 113 ("[E]quitable doctrines such as tolling or estoppel . . . are to be applied sparingly.").

Equitable estoppel, conversely, is available only when a plaintiff alleges that the defendant has "engaged in some form of 'affirmative misconduct' that prevented a timely filing." Azzam v. District of Columbia, No. 19-3365, 2022 WL 4182187, at *4 (D.D.C. Sept. 13, 2022) (citing Barbett v. Logistics Application, Inc., 845 F. Supp. 2d 164, 167 (D.D.C. 2012)).  Plaintiff makes no such allegation here.  Rather, she contends that Defendant's investigation of her EEO complaint was tardy and insufficiently thorough, thereby "depriv[ing her] of a full and fair investigation."  Opp. at 9.  Even assuming this to be the case, however, the adequacy of ICE's response to Feloni's January 7, 2021, complaint is immaterial to the question of whether the agency "induced or tricked" her to disregard the filing requirement for challenging subsequent discriminatory acts.  See Cristwell v. Veneman, 224 F. Supp. 2d 54, 60 (D.D.C. 2002); cf. Maybank v. Speer, 251 F. Supp. 3d 204, 207–08 (D.D.C. 2017) ("[N]either Title VII nor any judicial precedent . . . permits the Court to ignore a plaintiff's failure to comply with the 180-day

waiting period merely because the defendant agency failed to comply with an entirely separate regulatory requirement.").  Plaintiff's invocation of equitable estoppel thus suffers the same fate as her appeal to equitable tolling.

The Court therefore dismisses the components of Count I that are based on events that postdate Plaintiff's EEO charge — most specifically, her termination.  On the other hand, because she timely challenged her demotion, see Letter of Acceptance at 90; Compl., ¶ 31, any Title VII claims arising from that event survive, at least for now.

### 2.    Count III (Rehabilitation Act)

Defendant similarly contends that Feloni has not exhausted her Rehabilitation Act claim in Count III.  Plaintiff here alleges that "when [she] had the asthma-induced attack on her final training [in September 2021], she was treated differently than persons without disabilities or with different disabilities" in that she was denied the opportunity to re-do the timed run in question. See Compl., ¶ 51.  "Like many other discrimination statutes, [t]he Rehabilitation Act requires individuals to exhaust administrative remedies before they can file suit to enforce the Act's protections.  In some circumstances, the requirement is jurisdictional and thus may not be excused based on futility or equitable considerations.  But, in other circumstances, it is nonjurisdictional."  Williams v. Brennan, 320 F. Supp. 3d 122, 127 (D.D.C. 2018), aff'd, No. 18-5256, 2019 WL 669716 (D.C. Cir. Feb. 12, 2019) (internal quotation marks and citations omitted).  Although a plaintiff's failure to comply with administrative-filing deadlines may not deprive a court of subject-matter jurisdiction, "wholesale failure to file an administrative complaint or to obtain any administrative decision at all" does.  See Doak, 798 F.3d at 1103–04 (citing Spinelli v. Goss, 446 F.3d 159, 162 (D.C. Cir. 2006)).

Such is the case here.  Feloni's EEO charge makes no mention of the asthma attack that she suffered, and for good reason: that incident postdates the submission of her EEO charge by eight months.  See Letter of Acceptance at 90.  That complaint, moreover, does not state whether Plaintiff had notified ICE that she suffered from asthma, let alone indicate that Feloni had requested an accommodation from the agency for such a condition.  Id.; see Smith v. Lynch, 115 F. Supp. 3d 5, 20 (D.D.C. 2015) (plaintiff failed to exhaust remedies under Rehabilitation Act where she failed to request reasonable accommodations).  In fact, Plaintiff "does not plead . . . that she made any attempt to pursue, administratively, any Rehabilitation Act claims based on [her condition] through the appropriate EEO channels."  Lynch, 115 F. Supp. 3d at 19 (internal quotation marks omitted); see MTD at 14.

Because Count III comprises solely the claim that Feloni "was discriminated against due to her [asthma]," Compl., ¶ 4, the Court will dismiss it for lack of subject-matter jurisdiction.

C.      Failure to State a Claim

In addition to its jurisdictional arguments, DHS also maintains that Feloni's allegations are facially deficient on the merits.  The Court looks separately at her three surviving counts.

1.      Count I (Disparate Impact)

In seeking dismissal of the remainder of Count I — i.e., her demotion after her failing performance at FLETC — DHS asserts that Feloni's statistics do not suffice to make out a disparate-impact claim.  Plaintiff's central allegation in her Complaint is that ICE's requirement that male and female applicants for deportation-officer positions conform to the same physical-fitness standards "ha[s] a disparate impact on female applicants that is not supported by business necessity."  Compl., ¶ 40; see id., ¶ 1.  Specifically, she objects to the facially neutral

requirement that all trainees complete the PAA's 1.5-mile run in under 16:30 and that if they do not succeed on their first attempt, they must do so in under 14:30.

In support of her challenge, Feloni adduces statistics purporting to show that female trainees fail to meet these requirements at a far higher rate than do their male colleagues. See id., ¶¶ 12–15. In addition, she alleges that sex-neutral physical-ability tests typically have a negative impact on women, and she also presents general statistics about the composition of DHS's workforce. See id., ¶¶ 16–17. DHS, for its part, takes issue only with the statistics that relate to the completion of the PAA. It protests both that Feloni draws her data from a non-PAA training run and that her data measure a different universe of trainees from those participating in the PAA. See MTD at 17–22.

"In order to establish disparate-impact discrimination, [a plaintiff] must show that a facially neutral employment policy or practice has a significant disparate impact on a protected class of which he is a member." Jianqing Wu v. Special Couns., Inc., 54 F. Supp. 3d 48, 54 (D.D.C. 2014), aff'd, No. 14-7159, 2015 WL 10761295 (D.C. Cir. Dec. 22, 2015). "At this stage in the litigation, to be sure, [a plaintiff] need not prove a *prima facie* case of disparate impact." Id. Nevertheless, "[w]hen presenting a disparate impact claim, a plaintiff must generally 'demonstrate with statistical evidence that the practice or policy has an adverse effect on the protected group.'" Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev., 639 F.3d 1078, 1085–86 (D.C. Cir. 2011) (quoting Garcia v. Johanns, 444 F.3d 625, 633 (D.C. Cir. 2006)); see also Adams v. City of Indianapolis, 742 F.3d 720, 733 (7th Cir. 2014) (while "basic" "statistical methods and comparison" may suffice for disparate-impact complaint to survive  motion to dismiss, the statistics must "move the disparate-impact claims over the plausibility threshold").

The principal piece of evidence on which Feloni relies in challenging the PAA is a statistical analysis of results from the Physical Efficacy Battery (PEB), a different 1.5-mile training run administered at FLETC.  See Compl., ¶ 14; MTD at 18–19.  While conceding that this statistical evidence does not <u>directly</u> measure the results of the PAA's time-run component, Feloni argues that extrapolating from the PEB illustrates the sex-based disparities that this count challenges.  See Compl., ¶ 14.  A summary of results from the PEB has been published on FLETC's website; as they are referenced in the Complaint and available on a government website, the Court may consider these data.  See <u>Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Human Servs.</u>, 43 F. Supp. 3d 28, 33 (D.D.C. 2014).  The Court likewise takes judicial notice of undisputed facts in the pleadings about the operation of the PAA and PEB tests.  The PEB is administered to trainees across various law-enforcement agencies, not only ICE, and it is used to award commendations to high-performing trainees rather than to gauge whether an applicant has satisfied an agency's fitness requirements.  See Compl., ¶ 11; MTD at 18–19; Reply at 11.

FLETC has published results for the PEB's 1.5-mile run organized by sex, age group, and percentile.  See Compl., ¶ 14; MTD at 18–19.  To arrive at the "[f]ail [r]ates" she presents, Plaintiff superimposes on these PEB results the 16:30 and 14:30 time limits for the initial and remedial iterations of the PAA's 1.5-mile run.  See Compl., ¶ 14; MTD at 20–21.  For instance, females aged 35-39 who finish the PEB's run in under 14:30 would rank in the 73rd percentile or above for their sex and age group on that test.  See MTD at 20–21.  From the fact that 72% of women aged 35–39 took longer than this to complete the PEB's timed run, Plaintiff concludes that 72% of female Deportation Officer trainees in the same age group would also fail to complete the PAA's timed run in under 14:30.  See Compl., ¶ 14.  For men aged 35–39, on the

other hand, a run time of 14:30 would place them near the 29th percentile.  From this, Plaintiff

infers that trainees of this age group would fail the PAA's run at a rate of only 29%.  Id.

Although the issue is a close one, Feloni's statistical evidence is sufficient to "nudge[]"

her disparate-impact claim "across the line from conceivable to plausible."  Twombly, 550 U.S.

at 570; see Opp. at 19.  At this stage, her sole burden is to "allege some statistical disparity,

however elementary, in order for [DHS] to have any sense of the nature and scope of [her]

allegation."  Jianqing Wu, 54 F. Supp. 3d at 54 (quoting Brady v. Livingood, 360 F. Supp. 2d 94,

100 (D.D.C. 2004)).  That Plaintiff has surely done by identifying such stark disparities in

another 1.5-mile training run used by federal law-enforcement agencies.

It is true that she must ultimately offer "statistical evidence of a kind and degree

sufficient to show that the [PAA] has caused the exclusion of [women]" from deportation-officer

positions in order to prevail on her disparate-impact claim.  See Watson v. Fort Worth Bank &

Tr., 487 U.S. 977, 994 (1988).  To the extent that Defendant insists that Feloni make such a

showing at this juncture, however, that argument gains no traction, nor does DHS's position that

the differences between the PAA and the PEB cast sufficient doubt on the precision of her

extrapolated data to warrant dismissal.  See Tolton v. Day, No. 19-945, 2020 WL 2542129, at

*26–27 (D.D.C. May 19, 2020) (allowing disparate-impact claim to proceed despite "a number

of flaws" with its "statistical evidence" and explaining that "at the pleading stage courts do not

generally scrutinize causation claims or evaluate the degree to which other variables might be

responsible for an observed disparate effect"); see also Menoken v. McGettigan, 273 F. Supp. 3d

188, 199 (D.D.C. 2017), aff'd sub nom. Menoken v. Pon, No. 17-5228, 2018 WL 2383278 (D.C.

Cir. May 9, 2018) (denying motion to dismiss disparate-impact claim whose allegations were

"barely sufficient to create an inference of causation" and explaining that "[the p]laintiff will now have to . . . come forward with the necessary statistical evidence").

In addition to estimating the disparity in the PAA's fail rates for men and women, Feloni also draws upon a 2018 EEOC report on "Recruitment & Hiring Gender Disparities in Public Safety Occupations." Compl., ¶ 16. She first points to statistics in that report that reveal a gender imbalance in enforcement positions at Customs and Border Protection, which, like ICE, is housed within DHS. See id. ("Of 605 Customs & Border Protection Interdiction jobs, 0% were women, and of 19,749 Border Patrol Agents, 5% were female in 2016.") She also quotes that report's finding that law-enforcement agencies' use of gender-neutral physical-ability tests generally has a negative impact on women. See id. The cumulative effect of these facts when paired with Plaintiff's extrapolated data is to "suggest a lingering form of the problem that Title VII was enacted to combat." Watson, 487 U.S. at 990; cf. Howard v. Gutierrez, 571 F. Supp. 2d 145, 150 (D.D.C. 2008) (denying motion to dismiss disparate-impact claim because combination of "flaw[ed]" statistical data that would not suffice at trial, information from employer's website about role of challenged practice in promotion decisions, and "anecdotal evidence regarding the pattern of alleged discrimination" was enough to "overcome [the defendant's] motion to dismiss for failure to adequately plead causation").

Count I therefore may proceed as to demotion.

### 2. Count II (Intentional Discrimination)

In moving to dismiss Count II, Defendant argues that Feloni does not plead sufficient facts to support an intentional sex-discrimination claim. See MTD at 22–23. To determine whether "intentional[] discrimin[ation]" claims "can survive [a] motion to dismiss, . . . the Court applies the familiar test from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)."

Achagzai v. Broad. Bd. of Governors, 170 F. Supp. 3d 164, 180 (D.D.C. 2016).  While Plaintiff "need not [go so far as to] establish a prima facie case under the McDonnell-Douglas [test], the plaintiff must still allege enough facts, taken as true, which render her claim of discrimination plausible" within the context of that test.  Easaw v. Newport, 253 F. Supp. 3d 22, 29 n.4 (D.D.C. 2017) (internal quotations and alterations omitted).  "Under this test, '[a] plaintiff makes out a prima facie case of disparate-treatment discrimination by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'"  Achagzai, 170 F. Supp. 3d at 180–81 (quoting George v. Leavitt, 407 F.3d 405, 412 (D.C. Cir. 2005)).  Defendant argues that Plaintiff fails the third prong because her alleged facts do not give rise to a "plausible inference of discrimination."  MTD at 23.

There are multiple ways Feloni could satisfy the third prong.  George, 407 F.3d at 412. One way requires that she show she "was treated differently from similarly situated employees who are not [women]."  Redmon v. YMCA of Metro. Washington, 417 F. Supp. 3d 99, 102 (D.D.C. 2019) (quoting George, 407 F.3d at 412) (internal quotations and alterations omitted).

The section of Feloni's Complaint making out her claims as to Count II contains a number of jumbled allegations, including one related to disparate impact.  See Compl., ¶¶ 44–45. She does, however, include one allegation that sufficiently gives rise to an inference of intentional discrimination in ¶ 46.  That paragraph alleges that Plaintiff "was treated differently than similarly situated males who were permitted to retry the physical training after an injury in training."  Id., ¶ 46.  Feloni's inability to reattempt her training run post-injury directly precipitated an adverse action: her demotion to a GS-04 Mail Room Clerk.  Id., ¶¶ 29, 31; see also Clipper v. Billington, 414 F. Supp. 2d 16, 22 (D.D.C. 2006) (defining "[a]dverse

employment action" as "'a demotion evidenced by a decrease in wage or salary'" or "'a less distinguished title'") (quoting <u>Burlington Indus. v. Ellerth</u>, 524 U.S. 742, 761 (1998)).  Feloni thus sufficiently pleads the three <u>McDonnell-Douglas</u> elements in ¶ 46 and may proceed on this claim.

Her other claims in Count II, however, do not survive.  For example, ¶¶ 44–45, which allege DHS's knowledge of differences in success rates in training for women and men, do not allege <u>intentional</u> discrimination, but only disparate impact.  Feloni essentially attempts to repackage her disparate-impact claim as an intentional-discrimination claim by pleading comparators.  To make a case for intentional discrimination based on comparators, however, one must allege that "similarly situated employees of a different [sex] received more favorable treatment" in the same factual circumstance.  <u>Wheeler v. Georgetown Univ. Hosp.</u>, 812 F.3d 1109, 1115 (D.C. Cir. 2016) (quoting <u>Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO</u>, 548 F.3d 137, 145 (D.C. Cir. 2008)); <u>see also</u> <u>Burley v. Nat'l Passenger Rail Corp.</u>, 801 F.3d 290, 301 (D.C. Cir. 2015).  According to the Complaint, the training and testing are the <u>same</u> for men and women — undermining an inference that men receive more favorable treatment.  <u>See</u> Compl., ¶¶ 1–2.

Feloni's allegations in ¶ 47 fail for the same reason.  There she states: "Plaintiff further alleges that ICE discriminated against her because of her sex when an instructor rejected her for allegedly moving her hand in a push-up."  Again, <u>Wheeler</u> requires that Plaintiff support her allegations with sufficient factual material showing that a different group received more favorable treatment.  <u>See</u> 812 F.3d at 1115.  Yet Feloni does not plead that men in this instance were treated differently — for example, by being allowed to move their hands while performing pushups when she was not.  Without more, ¶ 47 does not "allege enough facts [to make] her

claim of discrimination plausible." Easaw, 253 F. Supp. 3d at 29 n.4 (internal quotation marks and citation omitted); see also Redmon, 417 F. Supp. 3d at 103 (noting that intentional-discrimination claims must "go beyond an unadorned, the-defendant-unlawfully-harmed-me accusation") (quoting Easaw, 253 F. Supp. 3d at 30).

In sum, only the allegations of intentional discrimination in ¶ 46 survive DHS's Motion.

### 3.     Count IV (Retaliation)

Last up is Count IV, which alleges retaliation under both Title VII and the Rehabilitation Act. "To prove unlawful retaliation, an employee must establish three elements: that she made a charge or opposed a practice made unlawful by Title VII [or the Rehabilitation Act], that the employer took a materially adverse action against her, and that the employer took the action because of her protected conduct." Allen v. Johnson, 795 F.3d 34, 38–39 (D.C. Cir. 2015) (citing McGrath v. Clinton, 666 F.3d 1377, 1380 (D.C. Cir. 2012)); Bain v. Off. of Atty. Gen., No. 21-1751, 2022 WL 17904236, at *19 (D.D.C. Dec. 23, 2022) (same standard for Rehabilitation Act). No one disputes that Feloni "made a charge" and that her employer "took a materially adverse action against her" by proposing and then executing her termination. See Compl., ¶ 34 (describing EEO complaint for gender and disability discrimination); MTD at 28–31 (focusing entirely on causation prong of retaliation standard). Defendant thus moves to dismiss on the ground that Plaintiff does not plead sufficient facts showing that ICE terminated her because of her protected EEOC activity.

In attempting to allege a causal connection between her protected activity and her termination, Feloni does not offer direct evidence, but instead relies on temporal proximity, which requires showing a "very close" link in time between two events: "an employer's knowledge of protected activity and an adverse employment action." Keys v. Donovan, 37 F.

Supp. 3d 368, 372 (D.D.C. 2014) (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273

(2001)).  For purposes of this Motion, the Court reads the term "employer" liberally to include

supervisory employees at ICE generally, not merely the one individual, Unit Chief Jack Bonner,

who proposed her termination.  See Wang v. Washington Metro. Area Transit Auth., 206 F.

Supp. 3d 46, 84 (D.D.C. 2016) ("[T]hat the employer had knowledge of the employee's

protected activity and the adverse personnel action took place shortly after that activity can be

adequate to permit an inference of retaliatory motive on the part of a supervisor.") (emphasis

added and internal quotations and citations omitted).

The first question to resolve, therefore, is when relevant ICE supervisors knew of her

protected activity.  Feloni offers nothing helpful on this point.  All she alleges is that she filed an

EEO charge.  See Compl., ¶ 8.  The Court could infer that the EEOC would notify relevant ICE

employees at some point, but Feloni never pleads when this might have occurred.  Id., ¶¶ 53–55

(lacking discussion of employer knowledge).  The best the Court can do is to consider EEO's

Notice of Charge, which it took judicial notice of in Section B.1 above.  See Notice of Charge at

98.  That document shows that Section Chief Robert Franks was issued notice of Feloni's EEO

Complaint on September 30, 2021.  Although the document explicitly states that "this

information should not be shared with anyone who does not have a need to know," viewing this

information in the light most favorable to Plaintiff, it suffices to allege employer knowledge.

The next question, then, is whether Feloni pleads "very close" temporal proximity

between her employer's presumed knowledge on or around September 30, 2021, and her adverse

action — namely, her proposed termination on January 21, 2022.  Almost four months separates

these dates.  "Although 'neither the Supreme Court nor the [D.C. Circuit] has established a

bright-line three-month rule,' this Circuit has generally found that such a gap between the

protected activity and the adverse employment action negates the temporal proximity needed to prove causation." Keys, 37 F. Supp. 3d at 373 (quoting Hamilton v. Geithner, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012)); see Taylor v. Solis, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (rejecting interval of two and a half months as establishing temporal proximity and citing, with approval, cases that did not find temporal proximity when two to three months elapsed between protected activity and adverse employment action). Put simply, nearly four months does not rise to the level of "very close" temporal proximity. Clark, 532 U.S. at 273.

Without any other evidence of retaliation, the Court is constrained to dismiss Count IV.

## IV.    Conclusion

The Court, accordingly, grants Defendant's Motion to Dismiss except with regard to the demotion claim in Count I and the claim in ¶ 46 of Count II. A contemporaneous Order will so indicate.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  May 1, 2023

22